David R. Olsen, #2458
Paul M. Simmons, #4668
Charles T. Conrad, #12726
DEWSNUP, KING & OLSEN
36 South State Street, Suite 2400
Salt Lake City, Utah 84111-0024
Telephone: (801) 533-0400
Facsimile: (801) 363-4218

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF

UTAH, CENTRAL DIVISION

| | |
|---|---|
| JOHN ANTHONY LOEBACH and VALERIE B. LOEBACH, individually and as the natural parents and heirs of M.L., a minor, deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>DIAMOND RANCH ACADEMY, a corporation,<br><br>Defendant. | **COMPLAINT AND JURY DEMAND**<br><br>**Civil No.** _____<br><br>**Honorable** _____ |

Plaintiffs, John Anthony Loebach and Valerie B. Loebach, individually and as the natural parents and heirs of M.L., a deceased minor, by and through their counsel of record, Dewsnup, King & Olsen, hereby complain of Diamond Ranch Academy and allege the following:

## PARTIES

1. M.L., a deceased minor child, resided in Hurricane, Utah, at the time of his death but was a citizen of Colorado and was domiciled there. M.L. is the son of John Anthony Loebach and Valerie B. Loebach (the "Loebachs").

2. Plaintiff John Anthony Loebach is the natural father of M.L., a minor who was sixteen years old at the time of the incident that gives rise to this action. John Anthony Loebach is a citizen of Colorado.

3. Plaintiff Valerie B. Loebach is the natural mother of M.L. and is a citizen of Colorado.

4. Diamond Ranch Academy ("DRA") is a Utah corporation with its principal place of business in Hurricane, Utah.

## JURISDICTION

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendant and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Plaintiffs have complied with all requirements of Utah Code Annotated, §§ 78B-3-401, *et seq.*, in order to bring an action against Diamond Ranch Academy pursuant to the Utah Health Care Malpractice Act.

## **GENERAL ALLEGATIONS OF FACT**

7. DRA is a residential treatment center and therapeutic boarding school in Hurricane, Utah, for troubled youth between the ages of 12 and 18.

8. DRA holds itself out as "an industry leader in helping youth realize their potential." It represents that its students "become their best selves in a structured elite private school environment with a personalized therapeutic approach" and promises that "[t]he challenges you are facing with your child today do not need to limit the possibilities of tomorrow."

9. DRA employs, among others, licensed clinical social workers. DRA's theme is "Healing Families One Youth at a Time."

10. M.L. was a sixteen-year-old boy who suffered from severe depression and had a history of suicide attempts.

11. Before M.L.'s enrollment at DRA, he attempted suicide twice. On one occasion M.L. tried to take his own life by hanging himself by the neck in the shower.

12. M.L.'s parents, the Loebachs, were very worried about their son's safety, not knowing what he was capable of doing in the future. They felt helpless not knowing what they could do to help their son.

13. The Loebachs sought an intervention treatment provider that could effectively care for their son and keep him safe.

14. In their search for a provider, the Loebachs came in contact with DRA.

15. DRA assured the Loebachs that if they enrolled M.L. at DRA, DRA would care for M.L. and keep him safe, and that DRA's program would help him overcome his hardships.

16. DRA also assured the Loebachs that DRA staff were trained to keep and capable of keeping M.L. safe from suicide attempts.

17. DRA further assured the Loebachs that the DRA facility was a safe place for their son.

18. In furtherance of keeping M.L. safe, DRA told the Loebachs that M.L.'s bedroom would be under constant video surveillance.

19. DRA also told the Loebachs that DRA personnel would, at all times, be monitoring the video surveillance images of M.L.'s bedroom.

20. Video camera surveillance equipment was present in M.L.'s bedroom during M.L.'s residence at DRA, including the day he committed suicide.

21. The DRA Parent Manual states in part: "Our program is proven effective – **and we guarantee it** – when the program is followed closely and when the parents support it completely."

22. The DRA Parent Manual further states: "We recognize how difficult a decision it was to intervene on your child's behalf. We also recognize how difficult it is to place the care of you child in the hands of another. *Please take comfort in knowing that we take our responsibility very seriously*."

23. On June 23, 2013, relying on DRA's assurances that M.L. would be properly supervised and kept safe, the Loebachs enrolled M.L. at DRA, and M.L. moved into the facility.

24. On June 23, 2013, the day M.L. was enrolled at DRA, Valerie Loebach gave DRA a summary of M.L.'s suicide attempts. This summary included an account that M.L. had previously attempted suicide by hanging himself in the shower.

25. M.L.'s pre-participation physical evaluation also noted his suicide attempt history.

26. DRA knew of M.L.'s need for supervision and treatment.

27. On July 18, 2013, DRA took M.L. off of self-harm watch.

28. On August 7, 2013, M.L. was psychologically evaluated by C.Y. Roby, Ph.D., NCCE ("Dr. Roby"), at DRA's request.

29. On August 30, 2013, DRA received Dr. Roby's report.

30. Dr. Roby's report indicated that M.L. was at risk for suicide and/or self-injurious behavior. Dr. Roby strongly recommended that this risk be taken seriously.

31. In addition to having Dr. Roby's report, DRA was in possession of and had read M.L.'s journals containing a drawing of a boy hanging from the neck.

32. On September 6, 2013, M.L. attended a football game pep rally in the DRA gym. While there, he was visibly upset and seen crying by another DRA student. When the pep rally concluded, M.L. left the gym unsupervised and unaccounted for.

33. After the pep rally, at approximately 4:22 p.m., M.L. entered his bedroom unsupervised.

34. At approximately 4:36 p.m., M.L. reviewed a suicide note he had written.

35. At approximately 4:38 p.m., M.L. entered his bathroom with his suicide note in hand and closed the door. He was clothed and wearing the belt DRA sold to him.

36. At approximately 5:01 p.m., while giving prospective clients a tour of the facilities and M.L.'s room, a DRA staff member opened the bathroom door and discovered M.L. hanging by the neck from a non-breakaway shower rod with the belt DRA sold to him.

37. When the staff member discovered M.L. and saw him hanging from the shower rod, he closed the bathroom door and ushered the prospective clients away.

38. Moments after the first staff member opened and closed the door on M.L., another staff member opened the bathroom door, looked at M.L., closed the door on him again, and walked away.

39. M.L. was left hanging from his neck until approximately 5:04 p.m., when DRA staff removed him from the hanging position and then administered CPR.

40. Approximately 2 ½ minutes passed between the time M.L. was discovered and the time he was removed from the shower rod.

41. Ultimately, M.L. was left unsupervised for a total of 39 minutes.

42. Two days later, on September 8, 2013, M.L. died as a result of the injuries he sustained from his September 6, 2013 suicide attempt.

## FIRST CLAIM FOR RELIEF
### (Negligence/Knowing and Reckless Indifference)

43. Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

44. DRA was acting in loco parentis and had a special legal relationship with M.L.

45. DRA had a duty to exercise reasonable care in the treatment and supervision of M.L.

46. DRA knew that M.L. had a history of attempted suicide and that M.L.'s suicidal condition should be taken seriously.

47. DRA knew that leaving M.L. unsupervised involved an extreme degree of risk, considering the probability and magnitude of the potential harm that such a lack of supervision presented to M.L.'s life and safety.

48. Despite DRA's knowledge of the risks that the lack of supervision of M.L. presented, DRA recklessly allowed M.L. to remain alone and unsupervised for more than thirty minutes, behind a closed door in a bathroom with a non-breakaway shower rod, with a belt to hang himself with.

49. DRA breached the duty that it owed to M.L. and the Loebachs, thereby creating a substantial risk of, and in fact causing, serious bodily injury and death to M.L.

50. DRA's breaches of duty included, among other things:

   a. Failing to provide M.L. with adequate supervision and care;

    b.    Failing to provide and/or follow policies and procedures related to supervision and care of M.L., its suicidal patient, including but not limited to its line-of-sight policy;

    c.    Failing to properly assess, document, and treat M.L.'s suicidal condition;

    d.    Failing to appropriately train staff;

    e.    Failing to install breakaway shower rods and shower heads in M.L.'s bathroom;

    f.    Failing to heed Dr. Roby's report and take M.L.'s risk of suicide seriously;

    g.    Providing M.L. with the belt he hanged himself with; and

    h.    Not acting immediately when it discovered M.L. but instead putting its public relations ahead of M.L.'s life.

51. DRA's acts and omissions manifested a knowing and reckless indifference toward and a disregard of the rights of others, including M.L. and the Loebachs.

52. As a direct and proximate result of DRA's acts and omissions, Plaintiffs have suffered and will continue to suffer the loss of the relationship with their son, causing them extreme mental and emotional anguish; loss of the care, comfort, companionship, society, guidance, love, affection, association, services and support of their son; and the permanent destruction of their family unit.

53. As a direct and proximate result of DRA's acts and omissions, M.L. suffered severe physical pain, discomfort, loss of enjoyment of life, and death, and the Loebachs incurred medical expenses prior to M.L.'s untimely death and have incurred funeral and burial expenses as a result of his death.

## SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

54. Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

55. DRA owed a fiduciary duty to Plaintiffs and/or their son.

56. DRA breached the fiduciary duty it owed to Plaintiffs and/or their son.

57. As a direct and proximate result of DRA's acts and omissions, Plaintiffs have suffered and will continue to suffer the loss of the relationship with their son, causing them extreme mental and emotional anguish; loss of the care, comfort, companionship, society, guidance, love, affection, association, services and support of their son; and the permanent destruction of their family unit.

58. As a direct and proximate result of DRA's acts and omissions, M.L. suffered severe physical pain, discomfort, loss of enjoyment of life, and death, and the Loebachs incurred medical expenses prior to M.L.'s untimely death and have incurred funeral and burial expenses as a result of his death.

## THIRD CLAIM FOR RELIEF
### (Premises Liability)

59. Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

60. M.L. was DRA's invitee.

61. DRA owed M.L. a duty of care to eliminate unreasonably dangerous conditions on its property and to take reasonable measures to ensure a safe physical environment in the DRA facility.

62. DRA was aware that the shower rods in the DRA facility were non-breakaway types and that the presence of such shower rods presented a dangerous condition to its invitee, M.L.

63. Given M.L.'s history of suicide attempts and Dr. Roby's evaluation, DRA should have expected that M.L. would have encountered and been harmed by, or would fail to protect himself from this dangerous condition of non-breakaway shower rods in the DRA bathrooms.

64. Three days after M.L.'s death, on September 11, 2013, the Utah Department of Human Services determined that DRA was in violation of Utah Admin. Code R501-19-7.B.2 for failing to provide a safe physical environment for consumers. This violation was due in part to the presence of permanently affixed shower rods in the DRA facility bathrooms.

65. DRA breached its duty to its invitee, M.L., and failed to exercise reasonable care by:

    a. Failing to prevent or rectify the unreasonably dangerous condition of non-breakaway shower rods on the property, which was a proximate cause of M.L.'s injury and death; and

  b. Failing to protect its invitee, M.L., from the unsafe condition and hazard of non-breakaway shower rods and shower heads on the property.

66. As a direct and proximate result of DRA's breach of duty, M.L. was subjected to the dangerous conditions on DRA's property that contributed to M.L.'s injury and death.

67. As a direct and proximate result of DRA's negligence, Plaintiffs have suffered and will continue to suffer the loss of the relationship with their son, causing them extreme mental and emotional anguish; loss of the care, comfort, companionship, society, guidance, love, affection, association, services and support of their son; and the permanent destruction of their family unit.

68. As a direct and proximate result of DRA's negligence, M.L. suffered severe physical pain, discomfort, loss of enjoyment of life, and death, and the Loebachs incurred medical expenses prior to his untimely death, and have incurred funeral and burial expenses as a result of his death.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendant, DRA, as follows:

1. For general damages in an amount to be proved at trial;

2. For special damages in an amount to be proved at trial;

3. For punitive damages in an amount sufficient to punish DRA and to deter DRA and others in similar situations from engaging in such conduct in the future; and

4. For such other costs, expenses, attorney's fees, and other relief the Court finds appropriate under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

**DATED** this 29th day of March, 2016.

**DEWSNUP, KING & OLSEN**

 /s/ Charles T. Conrad
David R. Olsen
Paul M. Simmons
Charles T. Conrad
*Attorney for Plaintiffs*

Plaintiffs' Address:
c/o DEWSNUP, KING & OLSEN
36 S. State Street, Suite 2400
Salt Lake City, Utah 84111